IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JUSTIN EVANS,

    Plaintiff,

    v.

WARDEN LAURA ARMSTEAD, et al.,

    Defendants.

Civil Action No.: JKB-21-603

**MEMORANDUM OPINION**

Defendants Laura Armstead, Thomas Wolfe, Winnie Mott, and Tameka Anderson[1] moved to dismiss Plaintiff Justin Evans' complaint, or alternatively, for summary judgment in their favor. ECF No. 17. Evans was informed by the Court, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), that the failure to file a response in opposition to the motion could result in dismissal of the complaint. ECF No. 18. To date, Evans has not filed a response. No hearing is necessary to determine the matters pending. *See* Local Rule 105.6 (D. Md. 2021). For the reasons stated below, defendants' motion will be granted.

**Background**

I.    Evans' Allegations

Evans' unverified complaint claims that he was exposed to and contracted the COVID-19 virus twice while housed at Patuxent Institution ("Patuxent"). ECF No. 1 at 1. He alleges that defendants failed to protect his health and welfare because, at the time of filing, they had not deep cleaned the facility since July 2020, which is the responsibility of Tameka Anderson and Thomas Wolfe. *Id.* Additionally, he claims Warden Laura Armstead and Winnie Mott have not required

---

[1] The Clerk shall be directed to amend the docket to reflect Defendant Tameka Anderson's correct name.

correctional staff to wear personal protection equipment ("PPE"), allowing for the spread of the COVID-19 virus at Patuxent. *Id.* at 2. Evans states he was placed in quarantine twice in January 2021. *Id.* He seeks monetary damages. *Id.*

II.     Patuxent Response to COVID-19

On March 5, 2020, Maryland Governor Lawrence J. Hogan, Jr. issued a state of emergency proclamation in response to the outbreak of the COVID-19 virus, a severe respiratory disease, presenting a public health emergency. Exhibit 1, ECF No. 17-3 at 1-2. Thereafter, Governor Hogan issued various executive orders limiting gatherings, encouraging social distancing, and mandating face coverings in certain settings. *See generally, id.*

Sharon Baucom, M.D., Director of Clinical Services for the Maryland Department of Public Safety and Correctional Services ("DPSCS"), attests that generally accepted medical practices prioritized COVID-19 testing based on a patient's illness and circumstances. Baucom Decl., ECF No. 17-4 at ¶ 3. DPSCS provides testing at its facilities through private health care contractors. *Id.* All inmates, correctional staff, and medical staff have had the opportunity to be tested for COVID-19. *Id.*; *see also* ECF No. 17-5 at 1-2.

Inmates suspected to have or who have tested positive for the COVID-19 virus are treated by the medical contractor and are placed in quarantine or isolated as appropriate. ECF No. 17-4 at ¶ 4. Inmates are released from quarantine only by medical order once they have recovered from the virus and are symptom-free. *Id.* They can return to housing anywhere in the facility. *Id.*

As of March 31, 2020, correctional staff are screened for elevated temperatures and mandated to wear a surgical facemask, a face shield or goggles, and gloves. Secretary's Directive EMD.DPSCS.055.0012, ECF No. 17-5 at 9; *see* ECF No. 17-6 at 16, 19-20. Asymptomatic inmates are quarantined following exposure to a confirmed COVID-positive or a "highly

2

suspicious case." ECF No. 17-5 at 9. They are required to wear surgical face masks, face shields or goggles, and gloves. *Id.* at 9-10. Inmates who test positive with COVID-19 or are suspected to be positive are additionally required to wear N95 respirators, if available. *Id.* at 10. On April 3, 2020, Security Chief Mott issued a bulletin prohibiting Patuxent staff from working at any other institution and prohibiting staff at neighboring institutions from working at Patuxent. ECF No. 17-6 at 21.

Patuxent housing unit officers must ensure that Respiratory Infection Isolation Areas have proper signage, that the doors remain closed at all times, and that designated medical equipment is kept in the Isolation Areas. ECF No. 17-5 at 12. Additionally, all staff entering the Isolations Areas must wear full PPE if they are in contact with inmates, and to also wear an N95 respirator if they are likely to generate spray or droplets during acute care. *Id.* When exiting the Isolation Areas, staff are required to remove their PPE and perform hand hygiene procedures. *Id.* Inmates are required to stay in the groups assigned to them by medical practitioners as well as comply with medical orders to wear face masks or other PPE. *Id.* at 13.

Staff were permitted to remove their PPE only during meals, but were required to social distance whenever their PPE was removed. *See id.* at 25.

As of April 13, 2020, Patuxent was locked down in response to the pandemic. *Id.* at 28. Assistant Warden Wolfe notified staff that a deep clean would be conducted during the lockdown and that they were to use the minimum number of inmate dietary and sanitation workers necessary as well as restrict out of cell activity, including having meals in cell and suspending congregated religious activities. *Id.* at 28, 35. Inmate sanitation workers were directed to clean after each inmate shower and phone use, as well as to clean their respective tiers "daily twice each shift." *Id.* at 40.

Patuxent staff were further directed on April 26, 2020, that when assigned to or relieved from hospital duty, they must report to Patuxent an hour prior to their shift to be issued full PPE. ECF No. 17-6 at 2.

Patuxent was audited on May 1, 2020, finding that various improvements were needed, such as the placement of anti-microbial mats in entryways, that fresh PPE be worn when handling clean laundry, posting of a cleaning schedule, making more hand sanitizer stations available for staff, placing barriers in office spaces with two or more employees, and improved PPE disposal. *Id.* at 37-40. Additional Standard Operating Procedures were issued on May 6, 2020, directing inmate workers on the use of handheld sprayers for disinfection and hospital grade germicide was distributed. *Id.* at 22-26.

A second audit was conducted on May 18, 2020, where it was noted that some staff were seen congregating during meal time and some staff and inmates were wearing their PPE improperly. *Id.* at 42-44.

On May 20, 2020, the DPSCS Secretary issued a bulletin for Worksite Exposure Tracing protocol, which requires close contact tracing following the report of a positive COVID-19 test result. *See id.* at 3-5. Similar contract tracing procedures were put in place for inmates and contracted staff. *Id.* at 7-9. The DPSCS Secretary issued revised Standard Operating Procedures on July 17, 2020, directing staff to minimize movement of inmates, and requiring a 14-day quarantine period when moving inmates to a new housing unit or when returning to general population. *Id.* at 10.

A compliance review was conducted on July 10, 2020, in which all observed staff were wearing full PPE. *Id.* at 45. It was noted that additional signage was needed of the sanitation

4

schedule as well as hand washing signage in restrooms. *Id.* at 46, 50. All other previous issues had been resolved. *See id.* at 47-50.

III.   Evans' Medical History

Defendants provide Evans' medical records for July 2020 through June 2021, in support of their Motion. ECF No. 17-7. There is no record of Evans having a positive COVID-19 test during this period. *See id.* Evans was vaccinated against COVID-19, receiving shots on May 13, 2021, and June 3, 2021. *Id.* at 13.

## Standard of Review

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). A court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. Motions styled in this manner implicate the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261.

Because defendants filed their motion as a motion to dismiss, or in the alternative, for summary judgment, Evans was on notice that the court could treat the motion as one for summary judgment and rule on that basis. Accordingly, the court will review the claims against defendants

under the Rule 56(a) standard and will consider the exhibits filed in support of the dispositive motion.

The court informed Evans that he may file an opposition and advised him of the consequences of failing to do so. ECF No. 18. Evans, however, has not filed a response; instead he relies solely on his unverified complaint. ECF No. 1. Because Evans' complaint is unverified, its factual assertions may not be considered as evidence in opposition to defendants' motion. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); Fed. R. Civ. P. 56(c)(1)(A).

The court is mindful, however, that Evans is a self-represented litigant. A federal court must liberally construe pleadings filed by pro se litigants to allow them to fully develop potentially meritorious cases. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But liberal construction does not mean a court can ignore a clear failure in the pleadings to allege facts which set forth a claim. *See Weller v. Department of Social Services*, 901 F.2d 387, 391 (4th Cir.1990). A court cannot assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

## Discussion

I.       Eleventh Amendment Immunity

To the extent Evans sues defendants in their official capacities as DPSCS employees, they are immune from suit. Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and departments are immune from suit in federal court brought by its citizens or the citizens of another state, unless it consents. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id.* (citing *Florida Department of Health v. Florida Nursing Home Assn.*, 450 U.S. 147 (1981) (*per curiam*)).

7

While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. "A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Halderman*, 465 U.S. at 100 (emphasis in original). Additionally, claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). Thus, Evans' complaint is barred against defendants in their official capacities.

II.     Eighth Amendment Claim

The Eighth Amendment to the Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). An official is liable under the Eighth Amendment if he acts with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To satisfy the deliberate indifference standard, a plaintiff must demonstrate first, that the alleged deprivation is, objectively, sufficiently serious, and second, that subjectively, the prison official acted with a sufficiently culpable state of mind. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

An official violates an inmate's Eighth Amendment rights by exposing the inmate to conditions that pose "a substantial risk of serious harm" to their health. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotation marks and ellipses omitted).

8

The Eighth Amendment "protects against future harm," including a "condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Constitutional violations can arise from "the exposure of inmates to a serious, communicable disease" even if "the complaining inmate shows no serious current symptoms" and "even though the possible infection might not affect all those exposed." *Id.* "This includes confinement conditions that are 'very likely to cause serious illness and needless suffering' by 'exposure of inmates to [the] serious, communicable disease' of COVID-19." *Seth v. McDonough*, Civil Action No. PX-20-1028; 2020 WL 2571168 *10 (D. Md. May 21, 2020) (examining conditions in the context of pre-trial detainees).

There is no dispute that COVID-19 is a contagious disease that can cause serious respiratory illness. Nor is there a dispute that defendants were aware of the risk posed by COVID-19. Thus, the issue is whether defendants recklessly disregarded the risk posed to Evans.

The subjective component of an Eighth Amendment claim requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 307 (4th Cir. 2004). An official who knows of a substantial risk to inmate health of safety may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk known to the defendant at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000); *see also Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014).

9

Even viewing the evidence in the light most favorable to Evans, the Court finds that there is no genuine dispute that defendants responded reasonably and did not act with reckless disregard to Evans. Patuxent has instituted numerous procedures to mitigate the threat of COVID-19. The evidence demonstrates that in response to the pandemic, Patuxent has instituted extensive procedures regarding sanitation, PPE, social distancing, and contact tracing for both staff and inmates. Notably, Evans was vaccinated and nothing in the record demonstrates that he contracted COVID-19 during the time period in question. As such, defendants are entitled to the entry of summary judgment in their favor.

### Conclusion

Defendants' motion to dismiss, or alternatively, for summary judgment is GRANTED. Defendants are dismissed in their official capacities and judgment is entered in defendants' favor in their personal capacities.

A separate order follows.

Dated this **27** day of _____, 2022.

FOR THE COURT:

James K. Bredar
Chief Judge

10